OPINION
{¶ 1} Linda L. Hans, individually, and as executrix of the estate of Calvin G. Hans, deceased, plaintiff-appellant, appeals from the judgment of the Ohio Court of Claims in which the court granted the motion for reconsideration and motion for summary judgment filed by The Ohio State University Medical Center ("OSUMC"), defendant-appellee. *Page 2 
 {¶ 2} On January 31, 1997, Calvin G. Hans ("decedent"), was admitted to Samaritan Hospital in Ashland, Ohio, complaining of abdominal and groin pain. Tests revealed a mass near his kidneys, and he was transferred to OSUMC on February 1, 1997, for further care. On February 5, 1997, William Schirmer, M.D., and Barbara Howard, M.D., performed surgery on decedent, during which they removed the mass, kidney, and adrenal gland.
 {¶ 3} On February 22, 1997, the decedent was discharged and referred to Michael Stanek, an oncologist, for chemotherapy. On March 31, 1997, decedent underwent the first of three rounds of chemotherapy at OSUMC, which included the use of Bleomycin, a drug that places those with impaired renal functioning at high risk for toxic side effects. On April 21, 1997, decedent entered OSUMC for his second round of chemotherapy, at which time he complained of shortness of breath. Tests were ordered, and, on April 22, 1997, decedent was examined by a physician's assistant, who subsequently ordered chemotherapy that included Bleomycin. On May 12, 1997, decedent was admitted to OSUMC for the third round of chemotherapy. The decedent complained of shortness of breath, and, after an examination by a physician's assistant, decedent underwent chemotherapy that included Bleomycin.
 {¶ 4} On May 23, 1997, decedent was admitted to Samaritan Hospital after a near fainting episode. The decedent was transferred to OSUMC and admitted. He was treated and released May 27, 1997. On May 29, 1997, decedent was admitted to OSUMC for shortness of breath. The decedent continued to experience respiratory problems, and, despite treatment and a surgery over the next few months, his condition deteriorated. On July 20, 1997, decedent died after life support was withdrawn. *Page 3 
 {¶ 5} On September 11, 1998, appellant filed a complaint in the Franklin County Court of Common Pleas against Dr. Schirmer and several John Does, alleging medical malpractice. Appellant dismissed the action on July 26, 1999. On October 8, 1998, appellant filed a complaint against Dr. Stanek and several John Does. This action was dismissed on September 6, 2000, and refiled on August 22, 2001. The case was settled against Dr. Stanek.
 {¶ 6} On October 15, 2001, appellant filed the present action against OSUMC in the Ohio Court of Claims, alleging claims for medical negligence and wrongful death. On July 27, 2004, OSUMC filed a motion for summary judgment, asserting the action was barred by the statute of limitations. OSUMC contended that the cause of action accrued for purposes of appellant's claims on the date of decedent's death, July 20, 1997, or, in the alternative, either March 16, 1998, which was when Dr. Schirmer received service of a 180-day notice of appellant's intention to sue him, or September 11, 1998, the date of the filing of the first lawsuit. OSUMC claimed that, as of each of those dates, appellant was clearly aware that potential medical negligence and wrongful death claims existed. Appellant countered that the action did not accrue for purposes of the statute of limitations until early 2001, when C. Harris Spiridonidis, M.D., opined that Dr. Schirmer, an unknown physician's assistant, and unknown nurses were negligent in their treatment of decedent. The court denied the motion for summary judgment on August 23, 2004. On November 2, 2005, OSUMC filed a motion for reconsideration of the trial court's denial of summary judgment. On December 4, 2006, the court granted OSUMC's motion for reconsideration and motion for summary judgment, concluding that causes of action accrued on July 20, *Page 4 
1997, decedent's date of death. Appellant appeals the judgment of the trial court, asserting the following assignment of error:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF IN GRANTING DEFENDANT'S MOTION FOR RECONSIDERATION AND MOTION FOR SUMMARY JUDGMENT, RULING AS A MATTER OF LAW PLAINTIFF'S ACTION WAS BARRED BY THE EXPIRATION OF THE STATUTE OF LIMITATIONS FOR MEDICAL MALPRACTICE AND WRONGFUL DEATH ACTIONS.
 {¶ 7} Appellant argues in her assignment of error that the trial court erred when it granted summary judgment to OSUMC. When reviewing a motion for summary judgment, courts must proceed cautiously and award summary judgment only when appropriate. Franks v. The Lima News (1996),109 Ohio App.3d 408. Civ.R. 56(C) provides that, before summary judgment may be granted, it must be determined that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the non-moving party, that conclusion is adverse to the non-moving party. State ex rel. Howard v. Ferreri
(1994), 70 Ohio St.3d 587, 589. When reviewing the judgment of the trial court, an appellate court reviews the case de novo. Franks, supra.
 {¶ 8} In its motion for summary judgment, OSUMC contended that appellant's claims for medical negligence and wrongful death were barred by their respective statutes of limitations. At relevant times during the proceedings below, the statute of limitations for medical malpractice actions was set forth at former R.C. 2305.11. That statute barred any action on a medical claim brought more than one year after the cause of action accrued. See R.C. 2305.11(B)(1). Further, a wrongful death action had to be brought within the *Page 5 
two-year statute of limitations set forth in R.C. 2125.02(D). However, R.C. 2743.16(A) provides:
 Subject to division (B) of this section, civil actions against the state permitted by sections 2743.01 to 2743.20 of the Revised Code shall be commenced no later than two years after the date of accrual of the cause of action or within any shorter period that is applicable to similar suits between private parties.
Thus, by the express terms in R.C. 2743.16(A), appellant's medical negligence claim was subject to the one-year statute of limitations in R.C. 2305.11(B)(1), while the wrongful death claim was subject to the two-year statute of limitations in R.C. 2743.16(A). See Stewart v. TheOhio State Univ. Med. Ctr., Franklin App. No. 02AP-888, 2003-Ohio-1110, at ¶ 5-6 (as a general rule, civil cases in the Ohio Court of Claims are subject to a two-year statute of limitations, pursuant to R.C.2743.16[A]; however, the two-year period is shortened when a shorter time period is applicable to similar suits between private parties, such as a medical claim under R.C. 2305.11[B][1]).
 {¶ 9} Appellant filed the present action October 15, 2001, approximately four years and three months after the decedent died, July 20, 1997, and ostensibly beyond the statutes of limitations for both claims. However, appellant argues that her claims did not accrue for purposes of R.C. 2743.16(A) and 2305.11(B)(1) until she discovered the "existence" and "role" of the physician's assistant and nurses at OSUMC. Appellant claims she did not know these individuals contributed to the decedent's death until her expert witness, Dr. Spiridonidis reviewed the medical records and informed her in the spring of 2001. Thus, she asserts, her filing of the present complaint in October 2001 was well within the relevant one-and two-year statutes of limitations. OSUMC counters that *Page 6 
the cause of action accrued on the date of decedent's death, July 20, 1997, or, in the alternative, either March 16, 1998, when Dr. Schirmer received service of the "180-day letter," or September 11, 1998, the date of the filing of the first lawsuit.
 {¶ 10} Neither R.C. 2743.16(A) nor 2305.11(B)(1) define the date of accrual. Consequently, the definition has developed over time in case law. It is now well-established that a cause of action for medical malpractice accrues and the statute of limitations commences to run upon the latter of either: (1) the termination of the physician-patient relationship for that condition, or (2) a patient discovers, or, in the exercise of reasonable care and diligence, should have discovered, the resulting injury. Oliver v. Kaiser Community Health Found. (1983),5 Ohio St.3d 111, syllabus. Under the discovery rule, a "cognizable event" triggers the statute of limitations. A "cognizable event" is defined as "some noteworthy event * * * which does or should alert a reasonable person-patient that an improper medical procedure, treatment or diagnosis has taken place." Allenius v. Thomas (1989),42 Ohio St.3d 131, 134. Thus, if a patient believes, because of harm she has suffered, that her treating medical professional has done something wrong, such a fact is sufficient to alert a plaintiff to the necessity for investigation and pursuit of her remedies. Id., citing Graham v.Hansen (1982), 128 Cal.App.3d 965, 973, 180 Cal.Rptr. 604.
 {¶ 11} In Flowers v. Walker (1992), 63 Ohio St.3d 546, the Ohio Supreme Court further explained the manner in which to determine when a cognizable event actually occurs. The court stated,"constructive knowledge of facts, rather than actual knowledge of their legal significance, is enough to start the statute of limitations running under the discovery rule. * * * [T]he `cognizable event' itself puts the plaintiff on notice to investigate *Page 7 
the facts and circumstances relevant to her claim in order to pursue her remedies." (Emphasis sic.) Id., at 549. Thus, "[a] plaintiff need not have discovered all the relevant facts necessary to file a claim in order to trigger the statute of limitations." Id. Accordingly, once the cognizable event occurs, a plaintiff must (1) determine whether the injury suffered is the proximate result of malpractice, and (2) ascertain the identity of the tortfeasor or tortfeasors. Id., syllabus. The occurrence of a cognizable event makes it incumbent upon that individual to investigate his or her case completely. Simonds v.Kearney, Wayne App. No. 01CA0035, 2002-Ohio-761. The identity of the practitioner who committed the alleged malpractice is one of the facts that the plaintiff must investigate, and discover, once she has reason to believe that she is the victim of medical malpractice.Flowers, at 550.
 {¶ 12} In addition to medical negligence claims, the Ohio Supreme Court has applied the discovery rule to numerous other situations, including wrongful death claims. See Harris v. Liston (1999),86 Ohio St.3d 203, 205-206, certiorari denied (2000), 529 U.S. 1053,120 S.Ct. 1555. Further, this court has also applied the discovery rule to the two-year statute of limitations contained in R.C. 2743.16(A). SeeWright v. Lima Correctional Facility (Sept. 21, 2000), Franklin App. No. 00AP-332.
 {¶ 13} In the present case, the trial court relied uponAllenius and Flowers to conclude that the cognizable event that triggered the accrual of appellant's causes of action was decedent's death on July 20, 1997. Appellant acknowledges Allenius andFlowers but claims the trial court failed to consider the Ohio Supreme Court's later decision in Akers v. Alonzo (1992), 65 Ohio St.3d 422, which appellant solely relies upon to refute the trial court's conclusion. In Akers, Akers began treatment with a urologist, Dr. *Page 8 
Alonzo. Dr. Alonzo performed an examination, and several biopsies of Akers's bladder were interpreted as evincing no signs of cancer. Akers was then referred to a second urologist, Dr. Wise, who requested the prior pathology slides and determined Akers had cancer. Nearly four years later, Akers filed a medical negligence action against Dr. Alonzo and an oncologist. It was only after the filing of that lawsuit that he learned from his medical expert of the involvement of a Dr. de Lamerens, who had originally misinterpreted the pathology slides as being negative for cancer. A year after the filing of the first complaint, Akers filed a second complaint that included a claim against Dr. de Lamerens. The trial court granted summary judgment to Dr. de Lamerens, finding the claims against him were barred by the statute of limitations. The court of appeals reversed that part of the trial court's judgment in favor of Dr. de Lamerens, holding that there was evidence from which reasonable minds could have concluded that plaintiffs had no basis for suspecting that Akers had been initially misdiagnosed by Dr. de Lamerens until their expert re-read the slides and found the alleged error.
 {¶ 14} The Ohio Supreme Court affirmed the appellate court inAkers. The court found Flowers distinguishable. In Flowers, the court found, the patient was aware that other persons were involved in the faulty interpretation of her mammogram, but she was not aware of their identities. When Flowers discovered approximately eight months later she had cancer, that discovery constituted the "cognizable event" which gave rise to a duty to ascertain the identity of the tortfeasors who misinterpreted her prior mammogram. In contradistinction, the court stated in Akers, there was nothing in the record that indicated that Akers knew or should have known that the pathology slides had been erroneously diagnosed as being negative for cancer. The "cognizable event" was when *Page 9 
Akers discovered through the expert that the pathology slides had been misread by Dr. de Lamerens. The court continued that, whileFlowers held that the occurrence of the cognizable event imposes a duty of inquiry on the plaintiff, it does not hold that the plaintiff has a duty to ascertain the cognizable event itself, especially in a situation such as there, where the patient had no way of knowing either that there had been another physician involved or that that other physician had made an incorrect diagnosis. Id., at 425-426. Therefore, the court concluded that, given the fact that plaintiff filed his action within one year of discovering the cognizable event, Akers' action was within the statute of limitations.
 {¶ 15} However, we find the present circumstances more akin to those in Flowers and find Akers distinguishable. In Flowers, as noted inAkers, the patient was aware that others were involved in the faulty interpretation of her mammogram, but she was not aware of their identities. In the present case, appellant was aware that the decedent had been treated by the doctors, physician assistant, and nurses. The records clearly indicated that decedent had received care from each of these persons. Unlike those records in Akers that lacked any indication that a previously unknown doctor had been involved with the misinterpretation of previously unknown pathology slides, the medical records here were fully available to appellant, and the identities of those involved in the alleged medical malpractice were readily recognizable on the face of the records. As found in Flowers, once appellant suspected medical malpractice had occurred upon the death of decedent, she had the duty to examine the records to determine the identities of all those involved, or possibly involved, in decedent's allegedly negligent treatment. It is immaterial that appellant may not have known the legal significance of the actions of the *Page 10 
physician's assistant and nurses; she must have only had constructive knowledge of facts sufficient to put her on notice to completely investigate the facts and circumstances and ascertain the identity of any tortfeasors.
 {¶ 16} Courts in numerous other cases have similarly concluded that the statute of limitations begins to run as long as the identities of the potential tortfeasors could have been discovered. In Kaplun v.Brenner (Mar. 3, 2000), Montgomery App. No. 17791, Dr. Brenner arranged for Kaplun to have a mammogram in December 1995, and Dr. Frost, a radiologist, read the mammogram as showing no suspicious masses. Soon thereafter, Brenner noted a lump in Kaplun's breast during her annual visit. Dr. Brenner assured her that it was merely fibrocystic breast disease. In December 1996, Kaplun had a second mammogram performed in anticipation of her annual exam by Dr. Brenner. Later that month, Dr. Brenner told Kaplun that, although he still believed she suffered from fibrocystic breast disease, he recommended she see a surgeon about the lump. In December 1996, Dr. Schmidt performed a needle biopsy and diagnosed Kaplun with breast cancer, and Kaplun underwent a mastectomy. Shortly after surgery, Kaplun discovered that, in Dr. Frost's report to Dr. Brenner about her 1995 mammogram, Dr. Frost recommended that Kaplun have a follow-up mammogram six months later, which was never conveyed to Kaplun. In August 1997, Dr. Hughes expressed concern over the medical care Dr. Brenner had provided to Kaplun. Kaplun filed a complaint against Dr. Brenner in January 1998. In a September 1998 amended complaint, Kaplun asserted a claim against Dr. Frost in the reading of her 1995 mammogram. The trial court granted summary judgment to Drs. Brenner and Frost, finding the cognizable event was the December 1996 diagnosis that commenced the running of the statute of limitations; thus, *Page 11 
the claims against them were filed beyond the expiration of the one-year statute of limitations.
 {¶ 17} The court of appeals affirmed the trial court's judgment. With regard to Dr. Brenner, Kaplun claimed the earliest she might have discovered Dr. Brenner's malpractice was when she received a copy of her medical records in January 1997. However, the appellate court found that the cognizable event was the date she was diagnosed with cancer, at which time she had an affirmative duty to determine whether malpractice had occurred and ascertain the identity of the tortfeasor. More pertinent to the present case, with regard to Dr. Frost, Kaplun claimed the cognizable event occurred in 1998, when her attorney's expert reviewed the 1995 mammogram films and opined that Dr. Frost may have misread them. However, the appellate court, relying uponFlowers, again found the cognizable event was the date she was diagnosed with cancer, at which point she had a duty to ascertain the identity of the radiologist who read her 1995 mammogram results and to determine whether he may have misread the films. The court found that the fact that she had never met Dr. Frost and had no knowledge of his identity or the fact that he had reviewed her 1995 mammogram films until January 1997, when she received her records, did not relieve her of her obligation to ascertain Dr. Frost's identity following her cancer diagnosis. The court in Kaplun rejected Kaplun's reliance uponAkers, stating that, unlike in Akers, Kaplun knew someone other than Dr. Brenner had read her 1995 mammogram films and forwarded a report to Dr. Brenner so he could inform her of the results, and likened Kaplun to the plaintiff in Flowers, who could have determined the identity of the radiologist who misread her mammogram before the statute ran. *Page 12 
 {¶ 18} In Van Boxel v. Norton Family Practice (Apr. 28, 1999), Summit App. No. C.A. 19229, Van Boxel complained to Dr. Lohmeyer of lower back pain in January 1991, and the doctor ordered x-rays be taken. Dr. Wu reviewed the x-rays, wrote a report, and sent the x-rays and the report back to Dr. Lohmeyer. In August 1993, Van Boxel went to Dr. Stokes and was admitted to a hospital for acute pyelonephritis. More x-rays were taken and reviewed by Dr. Wu. In 1993, Van Boxel was admitted to another hospital and was diagnosed with kidney stone disease.
 {¶ 19} By June 1994, Van Boxel's attorney knew of the existence of the records at Dr. Lohmeyer's office and knew that these x-rays could be reviewed. Also at that time, the attorney was in possession of Dr. Wu's report, as the interpreting radiologist. In January 1995, Van Boxel filed a complaint against Dr. Stokes. In May 1995, the action against Dr. Stokes was voluntarily dismissed. In May 1996, Van Boxel refiled the complaint for malpractice against Drs. Stokes, Lohmeyer, and Wu, among others. Drs. Stokes and Lohmeyer settled, and Dr. Wu was granted summary judgment based upon the statute of limitations.
 {¶ 20} On appeal, the appellate court affirmed the trial court. Relying upon Akers, Van Boxel contended she could not have discovered her claim against Dr. Wu until April 1996, when her expert witness reviewed Dr. Wu's report concerning her x-rays. However, the appellate court found that Van Boxel had possession of Dr. Wu's x-ray interpretation at the time of the first lawsuit and had the opportunity to obtain knowledge of the identity of Dr. Wu and his alleged malpractice at that time. The court further found that, even if Van Boxel needed an expert to discover Dr. Wu's alleged malpractice, Van Boxel still had the opportunity to identify Dr. Wu as a potential tortfeasor when the first lawsuit was filed. *Page 13 
 {¶ 21} This court addressed similar issues in Jones v. St. AnthonyMed. Ctr. (Feb. 20, 1996), Franklin App. No. 95APE08-1014. InJones, Jones injured his knee in December 1991, and received treatment and x-rays from Dr. Garcia, who informed Jones the knee was severely sprained but not fractured. The following day, Dr. Wang, a radiologist, interpreted the x-rays and found a small fracture. Jones continued to experience persistent pain, and sought further treatment from several doctors. In February 1992, Jones learned he had actually fractured his knee. In December 1992, Jones sent Dr. Garcia a 180-day notice of his intention to sue him. In June 1993, Jones filed his first complaint, naming Drs. Garcia and Wang as defendants, as well as others. In March 1994, Jones filed an amended complaint, naming Drs. Garcia, Wang, and others. The trial court granted summary judgment to Drs. Garcia and Wang, concluding that the statute of limitations barred Jones' claims.
 {¶ 22} On appeal, as pertinent to the present matter, Jones claimed his action against Dr. Wang was not barred by the statute of limitations because such was not triggered until he learned of Dr. Wang's involvement, relying upon Akers. However, this court found that the case resembled Flowers more than it resembled Akers. We found the cognizable event occurred in February 1992, when Jones discovered his knee was fractured. As in Flowers, this court reasoned, Jones knew that another physician would review his x-rays, and, unlike Akers, Jones was aware of the existence of the x-rays and other reviewing radiologists. Such awareness, we concluded, prompted his duty to discover the tortfeasors' identities.
 {¶ 23} In Stanley v. Magone (Dec. 11, 1995), Butler App. No. CA95-05-096, Stanley fractured her left arm and was treated at the Middletown Regional Hospital in *Page 14 
December 1988. One and one-half weeks later, Dr. Magone performed surgery on Stanley's arm. Dr. Ritan, a radiologist employed by the Middletown Regional Hospital, apparently consulted with Dr. Magone in conjunction with the surgery. Although Dr. Magone had never informed Stanley that a radiologist was involved in her care, Dr. Ritan billed Stanley for his services. Dr. Magone performed another surgery in April 1991. In April 1992, another surgeon, Dr. West, informed her that her arm was still broken, and she underwent another surgery.
 {¶ 24} While investigating a malpractice claim against Dr. Magone, Stanley obtained her medical records from Drs. Magone and West. However, she did not immediately request her records from the Middletown Regional Hospital. In April 1993, Stanley sent a 180-day notification letter to Dr. Magone. In December 1993, Stanley's expert, Dr. Gardner, reviewed her records from Middletown Regional Hospital and informed Stanley that Dr. Ritan may have negligently misread certain x-rays.
 {¶ 25} In December 1993, Stanley filed her medical malpractice complaint against Drs. Magone, Ritan, and others. Dr. Ritan moved for summary judgment based upon the statute of limitations. The trial court granted the motion, finding Stanley's cause of action accrued in April 1992, when she sought treatment from Dr. West. The trial court held that Stanley's hospital records, which referred to Dr. Ritan's radiology services, were sufficient to alert a reasonable patient to question whether those services played a role in any negligent treatment or misdiagnosis.
 {¶ 26} On appeal, relying upon Akers, Stanley argued the "cognizable event" triggering the statute of limitations on her complaint against Dr. Ritan did not occur before December 1993, when she first learned of Dr. Ritan's role in her treatment. Dr. *Page 15 
Ritan, on the other hand, contended that the cognizable event occurred, at the latest, sometime during the summer of 1992, when Stanley first realized that she had a medical negligence or malpractice claim. The appellate court in Stanley noted the disparate results in the two cases of Flowers and Akers and stated the results were indicative of the difficulty of the issue and suggested that the Supreme Court would consider the individual circumstances of each case. The court agreed with the trial court that the circumstances in Stanley were more like those in Flowers than in Akers. It found that Stanley realized she had a potential malpractice claim at some point during the summer of 1992, and, even though she had not met Dr. Ritan and did not know that he had examined an x-ray of her arm, her hospital records clearly indicated that Dr. Ritan had provided radiological services. Further, although Stanley first contacted her attorney in June 1992, she made no immediate attempt to review all of her medical records, and she did not immediately submit her medical records to her medical expert.
 {¶ 27} We find the above cases persuasive and analogous to the present case. In the current case, like the plaintiffs in the above cases, appellant had a duty to examine the decedent's medical records and ascertain the identity of medical personnel who may have rendered negligent care that proximately caused decedent's death. The fact that appellant might not have realized that the physician's assistant and nurses may have provided negligent treatment until her medical expert examined the medical records, did not relieve appellant of her duty to examine the available records and identify potential tortfeasors within the statutes of limitations. See Kaplun; Stanley. Further, even if appellant required an expert to discover the physician's assistant and nurses' alleged malpractice, appellant has failed to point to any evidence demonstrating that she did not *Page 16 
have the opportunity to identify them as potential tortfeasors when she filed her first lawsuit. See Van Boxel.
 {¶ 28} In addition, like several of the above cases, we find the present circumstances more like those in Flowers. As explained earlier, appellant knew others were involved in the decedent's treatment, these others were readily identifiable by the medical records, and appellant was aware of the existence of the medical records, similar to the plaintiffs in Kaplun, Van Boxel, and Jones. This was not a situation, as in Akers, in which appellant did not and could not have known of the existence of these providers or their reports.
 {¶ 29} OSUMC has suggested three options for the accrual date of the cause of action: (1) July 20, 1997, the date of decedent's death; (2) March 16, 1998, the date Dr. Schirmer received service of a 180-day notice of appellant's intention to sue him; or (3) September 11, 1998, the date of the filing of the first lawsuit. However, we need not determine which of these dates was the actual accrual date because even using the latest date, the filing of the first complaint in September 1998, appellant failed to timely file the present cause of action. It is clear in this case appellant certainly had a duty to search the medical records to determine possible tortfeasors as of the date of filing the first complaint.
 {¶ 30} Thus, even assuming the "cognizable event" was the date of the filing of the first complaint, appellant did not file the present action until after the expiration of the statutes of limitations for her claims and her action was barred. Therefore, the trial court did not err in granting OSUMC's motion for reconsideration and motion for summary judgment, and appellant's assignment of error is overruled. *Page 17 
 {¶ 31} Accordingly, appellant's assignment of error is overruled, and the judgment of the Ohio Court of Claims is affirmed.
Judgment affirmed.
 BRYANT and McGRATH, JJ., concur. *Page 1